May it please the Court, Brian Lundgren on behalf of the Space Needle. I'm going to limit my argument to the one key glaring error and primary error in the ALJ's decision. Well, this is just left to, we're down to Julia Dubey and Tracy McCauley? That's correct, Your Honor. Server recall. Server recall. All right. And there was a hearing, right? There was. And so we have findings from the ALJ. That's correct, Your Honor. So basically you have to convince us that substantial evidence, not, you're not arguing it in the first instance, you have to convince us that substantial evidence doesn't support or that there was some clearly erroneous factual findings or something along those lines, right? That's correct, Your Honor. And the ALJ's decision does not withstand substantial evidence review. And there's two, the glaring error is the ALJ's decision and the Board decision failed to hold the General Counsel to its burden to establish that discriminatory animus towards Julia Dubey's protected activity caused a manipulation of the recall process. And which of those points is wrong, that there was animus or that there wasn't manipulation? Both points are wrong, Your Honor. I'm going to address each one. Okay. Which is the glaring error? They both are glaring errors, Your Honor. Okay. Okay. And I want to direct the Court's attention to the Nichols aluminum case from the Eighth Circuit in 2015. It was issued during the briefing in this case. It's cited in our reply brief. And the Nichols aluminum case is very important, and it's right on point. And here's why it's important. With respect to animus, the Eighth Circuit concludes, and there was a vigorous dissent by the NLRB Board member, Mixamara, who's now Chairman, on these issues. And the Eighth Circuit accepts, one, you have to have, you can't just have general animus. You have to have animus that's connected to the discriminantee's specific protected activity. And number two, the Nichols aluminum case holds that the General Counsel bears the burden to prove causation, that there has to be a causal nexus established. And the Board had been trying to get away from this, articulating only that all we have to do is show animus and employer knowledge, and we've satisfied our burden. And Nichols aluminum and the dissent from the NLRB says, no, right line is a causation test, number one. Number two, the General Counsel has a 10C burden as a proponent of a violation to prove a violation. And that that protected activity and that that animus caused, in this case, the alleged manipulation of the recall process. First with respect to animus. I'll submit to you, and I won't go through it given the time. But all the animus highlighted by the Administrative Clause judge in her decision, none of it has to do with protected activity. None of it has to do with Dubie's protected activity. Well, the ALJ does indicate the holdings were that it was known to the employer that Dubie was a strong supporter of union activities. And the ALJ points to various indicia of anti-union animus at the time, like the speeches by the various people and statements made by supervisors. Isn't that enough to infer union animus, union worker animus? No, Your Honor, not on the substantial evidence of record, and here's why. I'll agree with your first point, that we are not challenging that Ms. Dubie engaged in various union activity. That's employer knowledge. We're not talking about employer knowledge. We're talking about do you have a statement or any indicia by any management person in this case that they said we don't like employees who participate in that conduct? But you can, it can be circumstantial evidence. You've got that statement that Dare made. Which statement is that, Your Honor? Well, let's see. We've got, I think you argue it's a misstatement, but I'm only doing what I'm told. Sure. After, this is in the summer, after the recall process, after Ms. Dubie has turned down the position of rehire at the Space Needle and no longer works for the Space Needle, and Ms. Dare says to her, I'm sorry, I only do what I'm told, I have to get a paycheck, you know I don't have anything against you. But, okay. That's not animus. But there's also, well, but you have to also look in the context of the, that there's something to this seniority that if you don't get recalled before your seniority expires, then you lose all sorts of benefits, right? And so that's what happened to her, right? And all of this was happening a month before she, it expired, and then they, and then the ALJ goes into detail about analyzing Heckenhorn's testimony, who is apparently the most senior, and there's discussion of the ALJ's, the ALJ does not agree with how the Space Needle interprets what has, what the historical evidence is, and how shifts and how this goes, and Heckenhorn says that he was not asked if he wanted to pick up an additional shift, even though he only had four shifts instead of the maximum allotment of five, and so you've got a lot of this all, this circumstantial evidence is all things that can be factored in. Circumstantial evidence still needs to be specific and substantial and not speculative. I'm going to leave the animus issue in a moment, Your Honor, and go to the issues you're talking about, because those are not supported by substantial evidence. But the statement by Dare that I was just doing what I told, it's undisputed that the seniority practice was followed, that servers were asked to take shifts in accordance with that policy, and no server testified that they were ever forced to take a shift. Well, it didn't seem that it was a force issue. That seems to go to more of the manipulation shenanigans, but let me just ask quickly about the animus again. There were also some emails in the record that the Board points to about Michael Douglas or somebody saying, you know, we're going to need to hire Julia Dubé unless you would put something in her record showing that she was a problem, and unless her time runs out, she's going to have to be hired again. So there was clearly some remarks in the record that were aimed at her. Those discussions were not that we're going to have to hire her. It was that if we do not hire her because she's complained about this, we're going to get another ULP from the union, and we don't want to do that. And there's nothing in her file, and Douglas told me. That's one way to argue it. And then the other way to argue it is the way that she argued it. So that's why I'm talking substantial evidence, that if you listened in the last case, yeah, you can make all those arguments, but no one's compelled to buy all of your arguments if there's contrary evidence. But the statement does not relate to any protected activity by Julia Dubé or any animus towards any protected activity by any employee. So this, look, I have one question about the... It's a management reason to rehire her. I have a question about what is focused on by the board, and that is this conversion of the on-call shifts to regular shifts, which didn't happen during the 50th anniversary, you know, was different than what had happened during the 50th anniversary. And to make a point that this seems to be an anomaly, what is the significance of that evidence? There's no significance. I'll take it through the on-call shift issue right now, Your Honor. Number one, the ALJ concluded that eight on-call shifts were dropped. That's not true. Five on-call shifts were converted to... Okay. We understand that, but they make the point that this had not been done before, that in general, that there was no precedent. And the examples that Space Needle provides, they say, are not relevant because they were either occurred within a bid or immediately prior or after a bid, but not in between two bids. And so they say that's an anomaly. It was a manipulation in order to avoid rehiring Dubé. That's not accurate. We provided a list of occurrences in our reply brief to this issue, number one. Number two, no... They said they were all distinguishable because they were all between, because the examples were either immediately before, after, or during a bid. I would invite you to look at the February 2012 example, which is ER 1225. On-call shifts, which are not regular shifts, as apples and oranges, they don't affect the adding of servers by recall at all. It's the number of shifts, regular shifts you add. An on-call shift isn't a worked shift. It doesn't matter. You don't recall employees to fill an on-call shift. You recall employees to fill an added shift. So, well, if you look at the evidence, what evidence did Space Needle offer of historical examples of so many shifts being added in between bids? What is in the record that supports that? I don't have the information at the top of my head. Because, I mean, my reading of the record is that there were no historical examples of so many shifts being added in between bids and so many on-call shifts being converted into full-time shifts at once. That's not accurate. Again, if you look at the February 2012, there's five employees that are recalled. On-call shifts are converted and picked up by existing servers. The five employees that are recalled are Amiko, Lindsey, Macaulay, Doobie, and an employee named Chris. The conversion of on-call shifts does not affect their recall. Let me just ask you one other thing. The other anomaly that the ALJ points to is that the ALJ testified otherwise. The ALJ didn't believe her. And then there's the one incident of Mr. Heckendorn says, I was not offered, or at least I don't recollect being offered a shift and I am the most senior. So that is their evidence of an anomaly in how this shift bidding was done. The General Counsel did not call one single server to testify that they were forced to take a shift. Well, forced is not the issue. The question is who was offered. Because the testimony was that the additional shifts are offered in the order of seniority. But Mr. Heckendorn says it was never offered to me and I am the most senior. So I don't see why being forced to take a shift just seems irrelevant here. Sure. The uncontradicted testimony was that all the shifts were offered and the employees chose to take the shifts. Mr. Heckendorn was asked, did anybody ask you to take a shift? And he said no. But then the follow-up question, because servers can ask each other to take shifts, the follow-up question he was asked, did management ask you to take a shift? And he said, not that I recall, but I am the most senior server and I never change my shifts. And then he was asked, have you ever been forced to take a shift by management? He said no. So you're saying his response is equivocal as to whether he was offered a shift as the most senior server. You're saying his response, I don't recall, was equivocal. I'm saying his response does not rebut the uncontradicted evidence of record that the seniority practice was followed and that the on-call asking of employees And what's the evidence besides DARE's testimony? Union President Van Rossum testified. If that practice had not been followed and somebody had been skipped, there would be a grievance filed. There was never any grievance filed. There was never an unlawful change in practice 8A-5 claiming that this system had been deviated from. In fact, all the 8A-5s were dropped. Could you briefly address causation because you're out of time here, but you said that was the second half. Sure. And I'm sort of addressing it now, Your Honor, is that the uncontradicted evidence does not support the conclusion that the server recall process was manipulated in any way. It was followed. The practice was followed. And that's what determined who was recalled. And the General Counsel presented no evidence. And importantly, under substantial evidence review, the uncontradicted evidence of record supports the conclusion that there was no manipulation of the recall process, Your Honor. Thank you.  Good morning. May it please the Court. Joel Heller for the National Labor Relations Board. Against the backdrop of contentious labor relations, Space Needle maneuvered to rid itself of a prominent union supporter. So does there have to be specific evidence showing animus to Julie Dubie for her union activities per Nichols Aluminum? Right. So the Board's position is that there does not have to be that kind of direct link between animus and the specific union activity here. And that to make out its, to show causation, the Board must, to show that union activity was a motivating factor in the decision not to recall, which is the right-line standard. The Board has to show, and this is the same three factors that this Court identified in Frankel v. HTH Corp., union activity, knowledge by the employer of that union activity, both of those are uncontested here, and animus. And so It says that the activity was a substantial or motivating reason for the employer's action, which is causal. So we have to, we certainly have to show that there's a causal link, correct? Yes. Right-line is a causation standard. And what has to be shown is that there is some action taken against, in this case, Dubie. So against the employee. Because of her protected activity. And so what's the best evidence that actions, let's assume for a moment there was manipulation, that that was done because of her union activity. What's the evidence? The evidence of animus? Is that what you're asking for? The evidence of cause that the company manipulated, let's assume for the moment they manipulated their recall process in order to avoid recalling her because of her union activity. What's the best evidence of that? Right. So to show that it was a motivating fact, the union activity was a motivating factor. The Board has to show the three factors we discussed above. And we're talking about the animus factor here. But because of. Yes. So what was the evidence of because of her union activity? So we have the contemporary other unfair labor practices. We have the anti-union rhetoric by the higher ups at the Space Needle, the CEO and the owner, including in those speeches that we talked about her here. The CEO of the Space Needle specifically addressed this pro-union letter that Dubie had circulated. Okay. So nothing specific to Dubie. Is that? He, that's what I was about to get to, Your Honor. Okay. Great. So this letter that he referred to, this pro-union letter that had been circulated to employees was circulated by Julia Dubie. He knew that the CEO of the company who was making this speech knew that Dubie had circulated that letter because when she sent it to fellow employees, one of the recipients forwarded it to Ron Siebert, the man who made this speech. The difficulty I'm having is you keep circling back to these generalities. And when we had some of the other practices in the case, it was a bigger case, a broader case. And now we're kind of down to short strokes of two employees and a very specific aspect of the labor practices, which is the servant recall. So maybe I'm back to Judge Acuda's first question, which is what's the connection with Dubie or the other person? Well, so those other violations, they're no longer in the case in that we're no longer asking the court to enforce them as unfair labor practices. But they still happen. The board still found that they happened. We're just not But how would those show cause as to her? It shows Or animus as to her? It is animus as to union activity. And that is what under the board standard and under this court standard in Frankel is required. If you are looking for the additional evidence that is not required in this by the board or this court, it may be required by the Eighth Circuit. But of course, we're not bound by the Eighth Circuit here. If you're looking for a more specific link, then the evidence I just presented to Judge Acuda about this speech Is it the board's decision that cause is shown in any case where there's evidence of general union animus and a union, somebody who's active in the union is not recalled or is not rehired, that there's always going to be cause just per se? Is that the position of the board? So these are all very factual, fact-based questions. Okay, so you're saying there's not a per se rule, that there has to be some factual link? So what I'm saying is that the three That's an easy yes or no question. All right. Is it a per se rule? Every time there's union activity and something happens to someone, does that mean it's caused by it? If there's evidence, there has to be evidence of animus. Well, so it's not a per se rule. You're frustrating me. I apologize. There was this general speech. I looked at the two speeches that were given, and it was clear that the company was frustrated by what was happening. So the question is, is that enough so that thereafter, any person, any employee who's active in the union can't and has something happen to them can claim it was because of their protected activity? There has to be a causal link between the animus and the It can't be anything that happens to them. What if someone shot someone at work and they get fired because they shot someone at work? But it was, it can't, you can fire someone for shooting someone at work, and I don't care whether there's, so it can't be. Yes. Sorry. You're having a hard time. It doesn't mean you lose just because you say it's not a per union activity, something happens to an employee. There does have to be some kind of connection between the animus and what happens to the employer. And so what we have, I apologize for taking so long. What we have in this case is this evidence that the board found of manipulation of the recall process. So wait, before we get to the manipulation, just let's get back to the relationship to Doobie. The evidence you have is the mention of the anonymous letter that was circulated. Is there any other evidence that's specific to Doobie? So we have the statements by Crystal Dare, which were mentioned earlier. Okay. Where she said, yeah, after the fact, I'm doing what I'm told, which doesn't seem to indicate animus, and I'm sorry, you know, I hope it doesn't affect us. We have that, but we also have earlier statements by Dare after these. Not to Doobie, to other people. Yes, no, to Doobie. After these speeches that we were discussing, Dare spoke to Doobie and she said, what do you think about this speech? Hey, wouldn't it be great if we didn't have to follow seniority, if I could just, if the shifts could go out in some other way? And Doobie says, no, I like seniority. It helps preserve jobs. There was another comment. That's evidence of animus? But the reality is, that's what they did. Yeah, that's what the testimony. I mean, the testimony is, I mean, she, wouldn't it be great if I didn't have to do this? And they say, no, but that's what we have to do, so. So Dare was also, I'm sorry. I'm having trouble kind of linking these up in either animus or causation. Dare was present for the speech. She heard that Sievert was displeased by Doobie's union activity of circulating this letter. There was another instance in which Crystal Dare spoke to Lou Christensen, one of the, he was the union steward in the shop. But that's not Doobie. Let me go to the manipulation. So there's two anomalies that the ALJ found. One of them was that there was a conversion of the on-call shifts to regular shifts. And the ALJ found that that was unprecedented. The Space Needle put in examples of where it had happened before. And the board's response, oddly, was that, well, they occur, they distinguish them as occurring either as part of a new bid or immediately prior to or after a new bid. So that latter statement, immediately prior to or after a new bid, says, yes, it happened on occasions when there wasn't, when it wasn't in the middle of the bidding process. So here, it's just, so there were examples. It seemed like the board acknowledged that there were examples where this conversion took place outside of the bid process. So why isn't that undercut the ALJ's finding that it was unprecedented? It was clearly, it was precedented. Okay, so the reason why those are not relevant comparisons, analogies, is, well, the ones that happen when it's exactly a new bid, those are, the entire schedule shifts at that point. Right. So those are not relevant. That I understand is distinguishable. The one example we were talking about before or after is the June 2011 bid where it's actually, the record is not all that clear about when the new bid started. At one point it says it starts on June 13th, but the June 13th schedule doesn't seem to be all that different from the previous. So I agree that that specific bid is a little confusing as to when the shift occurred. But there does seem to be a little flux period in the week immediately after, at least in this one example. But that's not what happened here. We have some, this in the 2013 bid that we're talking about in this case, the spring bid began in February. The summer bid began in June. And the manipulation occurred at the end of March. So it's really in the middle. We're not in any way close to the shift of a schedule. So it's distinguishable because the priors were not in the middle. They weren't during the bid period, but they weren't between two bids. So that's the basis for saying it's distinguishable. Is that what you're saying? It's distinguishable because it did not occur during the changeover in the bid. That occurred in the middle of the bid. Your footnote, it's hard for us to look at these spreadsheets and the like, that says it happened before or after a bid. It just, I guess, temporally, this time it was further away from the bid. I mean, it was before and after two bids. It was just not as close temporally. That's what you're saying, if I'm understanding. Yes. So the example, and again, and I apologize if this is not clear, it wasn't all that clear to me in the record, is it may have happened at the start of a bid because it is labeled at the front, you know, new bid starts this week. So it's certainly possible that it happened exactly in the change of the bid. And if it didn't happen, it happened a week after. Within, temporally close. Right, and here we're not temporally close. Okay, then the other anomaly the ALJ found was that the additional shifts were not offered in order of seniority. And there was one piece of evidence to support that, which was the testimony of John Heckendorn. And opposing counsel says, well, his response was fairly equivocal because he said, I don't recall that management did that, but, you know, I never changed my bid. So is that the only evidence that the additional server spots were not ordered in order of seniority? So that's a credibility determination as to whether what Heckendorn said shows that he was not asked and the board resolved their credibility in his favor. Not credibility, it's a what does the testimony mean? Well, the board found as a factual finding that he was not asked. Well, he wasn't asked, but if he said he kept the bid the same. Well, Space Needle's stated policy, which it says it followed, which is presenting as its defense, its affirmative defense here, is that what it normally does is it goes through in seniority order and asks the servers, do you want to take? Was there any other test? So there's the one sentence by Heckendorn. Was there any other evidence supporting the ALJ's finding? That was my question. As to whether the seniority, as to whether they didn't go through in seniority order. The chefs were offered in the order of seniority, which was Dair's testimony. Right. Heckendorn's testimony is our evidence that they were not. Okay. And then, in fact, when you go through, but isn't there other evidence that they did, in fact, because you go through the various people who were offered and it kind of bounces down the list of seniority, even into the people who were hoping to get recalled? I mean, so it's, it seemed, as I read the record, they had evidence that, in fact, they were going through in order of seniority. So, but Heckendorn, just let me preface this, so that while Heckendorn is the main testimony as to this example of manipulations, there were other examples of manipulations that the board found. So the ALJ, the board's finding that there was. One of the difficulties is that every time we ask a question, you seem to want to talk about something else. I will address your question directly then. And you're welcome to do that, but at your own risk. Heckendorn's testimony. Heckendorn was the most senior server. So if the policy, the procedures were not followed as to him, that throws off every subsequent decision. Because if he, if the procedures had been followed as to him, that would affect the decisions. It still wouldn't have been. Well, I don't think we can say that, because if he had made a different decision, then perhaps the second most senior person would make a different decision. Testify that he ever changes his bid. So that would be contrary to the evidence. But Space Needle's policy is not that, or its stated policy is not that it goes in seniority order, unless it thinks that some people might not take a new bid. They said they go in seniority order. They did not go in seniority order here. Okay, thank you. Thank you. Do you have a minute for rebuttal? Thank you, Your Honor. A couple points. Heckendorn. If the equivocal statement were construed as Heckendorn was not asked if he wanted to take one of the added shifts, that action would be to the benefit of servers who are laid off, because if Heckendorn had taken a shift, there would be less shifts available for laid-off servers to come onto the schedule. That would not be something somebody who is trying to discriminate against laid-off servers would do. Because if Heckendorn says, yeah, I'll take a fifth shift, never had it before, then there's less shifts for the laid-off servers. It doesn't make sense, number one. Number two, this after-the-fact, post-hearing attempt to meaningfully distinguish the on-call situations in the schedules where they drop and they come back on, the General Counsel, if their theory is that on-call was manipulated and you're the proponent of the burden, call somebody to say that happened. Call somebody to say that they didn't do what they normally do with on-call shifts. Call somebody. They didn't call anybody. And they didn't call anybody to testify that all these after-the-fact brief arguments about how, well, this was during a bid or this was after a bid, that that's meaningful. Because it's not meaningful. That's speculation. Everybody testified that they followed the seniority practice, both with shifts that were added by being converted from on-call and shifts that were added new. Crystal Dare took you through at least three people. If you look at ER 1131, if you look at Angie, Candace, and Amanda, you can see the conversion and acceptance of new on-call shifts. Crystal Dare took it through and said, I asked them. Last thing I want to say is the apples and oranges analysis where the ALJ tries to compare May 23, 2011 to March 25, 2013, that's speculation. The assumption is that somehow the servers in May of 2011 would have made the exact same ratio and type of decisions in accepting shifts as they would have made in March of 2013. There's nine servers who are not on both schedules. Nobody testified about that. It's unsupported, and it fails under substantial evidence review, just like all of the other attempts to say the Space Needle manipulated the schedule. There was no manipulation of the schedule. Thank you. Thank you, Your Honor. Thank you both for your arguments. Now that you've resolved your other matters, we're down to this one issue. So we appreciate you narrowing it. The case just argued is submitted. Thank you.
judges: McKeown, Callahan, Ikuta